Approved: _____
BRETT M. KALIKOW
Assistant United States Attorney

Before:  THE HONORABLE JAMES L. COTT
         United States Magistrate Judge
         Southern District of New York

**19MAG10215**

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA           :    **SEALED COMPLAINT**
                                   :
      - v. -                       :    Violation of 18 U.S.C.
                                   :    §§ 1343 and 2
DORAN SANTIAGO RAMOS,              :
                                   :    COUNTY OF OFFENSE:
              Defendant.           :    New York
                                   :
                                   :

- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

  DANIEL GABEL, being duly sworn, deposes and says that he is a Postal Inspector with the United States Postal Inspection Service ("USPIS"), and charges as follows:

COUNT ONE
(Wire Fraud)

  1. From or about September 2017, up to and including the present, in the Southern District of New York and elsewhere, DORAN SANTIAGO RAMOS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, RAMOS defrauded several individuals of approximately $1 million by inducing them to invest in and provide loans to a purported liquor production company ("Company-1") RAMOS controlled, by, among other things, providing falsified documents and making false representations to investors about the business activities and finances of Company-1.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

2. I am a Postal Inspector for the USPIS. I have been personally involved in the investigation of this matter, and I base this affidavit on that experience and on my examination of various documents and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3. Based on my review of publicly available information and bank records, I know, in substance and in part, that:

a. On or about November 20, 2012, Company-1 was incorporated as a domestic corporation in the State of Nevada.

b. On or about October 31, 2017, the annual list of officers, directors, and state business license application for Company-1 was filed with the state of Nevada, and provided that "Santiago Ramos" is the President of Company-1.[1]

4. Based on my interviews and communications with an investor in Company-1 ("Investor-1") and other witnesses, my review of documents and records provided by Investor-1, and my review of bank records for Company-1 and DORAN SANTIAGO RAMOS, the defendant, I have learned, in substance and in part, the following:

a. Company-1 maintained a business checking account at a major U.S. bank (the "Company-1 Bank Account").

b. In or about September 2017, DORAN SANTIAGO RAMOS, the defendant, met with Investor-1 in Manhattan, New York

---

[1] Company-1 is the primary corporate entity operated by DORAN SANTIAGO RAMOS, the defendant, for the purposes of this Complaint. Company-1 is also affiliated with other business entities, including at least one domestic entity and one foreign entity, also run by RAMOS and which share similar entity names.

2

about Investor-1's investing in a liquor company, controlled by Ramos, which manufactured tequila in Mexico and imported it for sale in the United States and elsewhere. RAMOS provided Investor-1 with a set of documents purporting to be Company-1's unaudited 2016 financial statements and other documents.

c. On or about October 10, 2017, Ramos emailed Investor-1 with a purported Balance Sheet and Profit and Loss Sheet for January through March 2017 for Company-1 (the "Purported 17Q1 Balance Sheet" and "Purported 17 Q1 P&L Sheet," respectively; the "Purported 17Q1 Documents," collectively). The Purported 17Q1 P&L Sheet indicated, among other things, that the income for February 2017 was approximately $2.75 million, which was comprised entirely of two invoices for a specific company ("Company-2").

d. On or about November 15, 2017, Investor-1 executed a written investment agreement with RAMOS, by which, in substance and in part, Investor-1 invested approximately $1,000,000 in Company-1 in exchange for, among other things, 6% equity and 6% gross revenue, and wired the money to the Company-1 Bank Account.

e. In or about January 2018, RAMOS led a group of investors (including Investor-1) on a trip to a farm in Mexico run by a Mexican company ("Company-3") where, according to RAMOS, the tequila for Company-1 was manufactured.

f. On or about February 14, 2018, Investor-1 made a loan of approximately $150,000 to Company-1.

g. In or about June and July, 2018, RAMOS provided Investor-1 with purported bank statements for Company-1's bank account for the months of November 2017 through June 2018 (collectively, the "Purported Bank Statements"). Specifically, on or about June 21 and July 10, 2018, RAMOS emailed directly to Investor-1 the Purported Bank Statements for the months of January through June 2018. On or about July 12, 2018, Investor-1 received the Purported Bank Statements for the months of November through December 2017 in an email from another individual; RAMOS was copied on that email.

h. On or about December 11, 2018, RAMOS spoke with Investor-1 by telephone. During the call, which was recorded and which recording I have reviewed, RAMOS and Investor-1 discussed, in substance and in part, that Company-1 had $1.8 million sales in 2018. Ramos stated that most of those sales were made by a distribution company in California

3

("Company-4"). RAMOS explained that the arrangement Company-1 had with Company-4 was that customers would pay Company-4, and Company-4 would then pay Company-1.

           i. The Purported Bank Statements contained numerous entries that are different from the corresponding entries on the actual bank statements for the Company-1 Bank Account. For example:

                i. An entry dated on or about December 15, 2017 in the actual bank records for the Company-1 Bank Account shows a debit (outgoing) transaction of approximately $30, containing a description indicating a "card purchase" and the name of a restaurant in Massachusetts. However, the corresponding entry in the Purported Bank Statement for that same date shows an approximately $2 million credit (incoming) transaction with the description "INTERNATIONAL INCOMING WIRE TRANSFER."

                ii. The actual bank records for the Company-1 Bank Account show that at the time of Investor-1's loan to Company-1 on or about February 14, 2018, the Company-1 Bank Account had a negative balance of approximately $125. However, the Purported Bank Statements show that, on or about that same date, the Company-1 Bank Account had a positive balance of approximately $2.7 million.

                iii. The Purported Bank Statements show that from on or about February 15, 2018, to on or about June 13, 2018, Company-1 made approximately seven debit transactions from the Company-1 Bank Account totaling approximately $3.4 million with identical transaction descriptions (other than the specific reference number for each transaction). Based on my training, experience, and my participation in this investigation, I believe that these transaction descriptions in the Purported Bank Statements contained words and abbreviations similar to, and intended to invoke, the name of Company-3. I further believe that RAMOS fabricated these outgoing transfers so as to suggest payments for product manufactured by Company-3 for Company-1. The actual bank statements for the Company-1 Bank Account covering the same period contained no transactions containing the same transaction description just described, or which appear to involve Company-3.

                iv. The Purported Bank Statements show that from on or about December 12, 2017 to on or about June 15, 2018, Company-1 had approximately 10 transactions, including debit transactions totaling approximately $155,000, and credit

4

transactions totaling approximately $3.8 million. Each of these transactions had descriptions that contained the name of Company-4. The actual bank statements for the Company-1 Bank Account covering the same period contained no transactions containing the name of, or appearing to involve, Company-4. Based on my training, experience, and participation in this investigation, I believe that RAMOS fabricated these transactions so as to suggest (a) payments by Company-1 to Company-4 that would allow Company-4 to import Company-1's products, and (b) payments by Company-4 to Company-1 representing profits generated by Company-4's sales of Company-1's products.

       5.    Based on my review of publicly available information and corporate records regarding Company-2, my interviews and communications with the proprietors of Company-2 ("Individual-1" and "Individual-2," respectively), my review of documents and records provided by Individual-1 and Individual-2, I have learned, in substance and in part, the following:

       a.    Company-2 is a liquor and wine import company based in Long Island, New York that has been in business for several years.

       b.    Company-2 is registered as an active limited liability company in the State of New York, and Individual-1 is its registered agent.

       c.    On or about January 1, 2017, Company-2 entered into an agreement to import liquor for Company-1. Pursuant to that agreement, in sum and substance, Company-2 would import and sell liquor on behalf of Company-1 and would then remit profits to Company-1. Company-2 opened a bank account for Company-1 to pre-fund for the payment of taxes and other import fees. However, neither DORAN SANTIAGO RAMOS, the defendant, nor Company-1 ever funded that account. As a result, Company-2 never imported or sold anything on behalf of Company-1.

       d.    In or about February 2017, Company-2 had two purchase orders for Company-1 totaling approximately $1.4 million (not the $2.75 million represented in the Purported 17Q1 P&L Statement). However, as noted above, Company-2 never fulfilled these purchase orders because Company-1 did not prefund the account necessary to complete the orders.

       6.    Based on my review of publicly available information and corporate records regarding Company-4, my

interviews and communications with the proprietor of Company-4 ("Individual-3"), and documents and records provided by Individual-3, I have learned, in substance and in part, the following:

  a. Company-4 is based in California and is an importer and distributor of liquor. Individual-3 is the registered agent for Company-4.

  b. In or about 2016, DORAN SANTIAGO RAMOS, the defendant, spoke with Individual-3, and reached a verbal agreement whereby Company-4 would import and sell Company-1-branded liquor from Mexico. From in or about September 2016 to in or about October 2017, Company-4 imported approximately 500 bottles of Company-1-branded liquor, of which Company-4 sold approximately 109 bottles for approximately $30 per bottle.

  7. Based on my conversations and communications with Investor-1, as well as my review of documents and records provided by Investor-1, I know, in substance and in part, the following:

  a. For email communications between Investor-1 and DORAN SANTIAGO RAMOS, the defendant—including the emails in which RAMOS sent Investor-1 the Purported 17Q1 Documents and the Purported Bank Statements—Investor-1 used an email address with the domain "gmail.com" (the "Investor-1 Gmail Account") and RAMOS used an email address with domain names associated with the names of Company-1 and affiliated entities (the "Company-1 Email Domains").

  b. Investor-1 lives in Manhattan, New York, and read many emails from RAMOS concerning Company-1 while Investor-1 was in Manhattan, New York.

  c. In one specific example, on or about April 20, 2019, RAMOS, using an email account with one of the Company-1 Email Domains, emailed Investor-1 at the Investor-1 Gmail Account, during which RAMOS discussed the business operations and financial needs of Company-1, and sought an additional investment from Investor-1 in exchange for an increased equity share. Investor-1 read this email while Investor-1 was in Manhattan, New York.

  8. Based on my review of an open source database and Google records, I know, in substance and in part, the following:

    a. The Company-1 Email Domains are hosted by Google.

    b. There are no records indicating that Google had Gmail servers in the State of New York for at least the period June 1, 2018 through May 10, 2019.

    c. Based on the foregoing facts, and based on my training, experience, and participation in this investigation, I believe that, for the period June 1, 2018 through May 10, 2019, any and all emails from RAMOS concerning Company-1 that Investor-1 read while Investor-1 was in Manhattan, New York traveled through interstate wires.

  WHEREFORE, deponent respectfully requests that an arrest warrant be issued for DORAN SANTIAGO RAMOS, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_____
DANIEL J. GABEL
Postal Inspector
United States Postal Inspection Service

Sworn to before me this
30th day of October, 2019

_____
THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

7